1
2
3
4
5
6
7

**UNITED STATES DISTRICT COURT**

**DISTRICT OF NEVADA**

| | |
|---|---|
| UNITED STATES OF AMERICA, ) | |
| ) | |
| Plaintiff, ) | Case No. 2:13-cr-00317-KJD-GWF |
| ) | |
| vs. ) | **FINDINGS &** |
| ) | **RECOMMENDATION** |
| RANDY JOHNSON, ) | |
| ) | |
| Defendant. ) | **Motion to Suppress (#23)** |
| _____ ) | |

This matter is before the Court on Defendant Randy Johnson's Motion to Suppress

Evidence for Fourth Amendment Violation (#23), filed on October 28, 2013. The Government

filed its Response in Opposition to Defendant's Motion (#27) on November 29, 2013. The Court

initially scheduled an evidentiary hearing on Defendant's motion for December 5, 2013. The

parties thereafter stipulated to several continuances of the evidentiary hearing which was eventually

conducted on June 18 and July 30, 2014.

## BACKGROUND

Defendant Randy Johnson is charged in a one count indictment filed on August 13, 2013

with possession of a controlled substance with intent to distribute in violation of 21 U.S.C. §

841(a)(1) and (b)(1)(A)(viii). *Indictment (#10).* The indictment arises out of a highway patrol

officer's traffic stop of Defendant's Johnson's rental vehicle on August 6, 2013, and the subsequent

search of that vehicle during which methamphetamine was found in the trunk. Defendant argues

that the vehicle search violated the Fourth Amendment and that the evidence resulting from the

search should be suppressed.

. . .

**NHP Trooper Ervin Raab.**

The Government called Nevada Highway Patrol (NHP) Trooper Ervin Raab as a witness at the evidentiary hearing. Trooper Raab has been employed by the NHP for approximately 18 years. He has been assigned to the Nevada Interdiction Task Force ("Task Force") for the past 3 years. The Task Force is made up of members of Southern Nevada law enforcement agencies, including the Nevada Highway Patrol, and the Las Vegas, Henderson and Mesquite, Nevada police departments. Task Force officers patrol Interstate Highway 15 ("I-15") which runs through Clark County, Nevada and which is a major corridor for transporting illegal narcotics into the United States from the southwest border. Task Force officers look for vehicles that are transporting large amounts of narcotics or currency derived from drug trafficking. Trooper Raab has taken classes to identify the behavior or characteristics of individuals engaged in drug trafficking and to identify where narcotics and money may be hidden in vehicles. Trooper Raab patrols in a marked NHP patrol car which is equipped with an audio-video recording system. The recording system is also linked to a global positioning satellite (GPS) which gives a reading on the speed of the patrol vehicle. While on patrol, Trooper Raab communicates by radio and cell-phone with other Task Force officers, including officers equipped with narcotics detection dogs, i.e., K-9 units.

Trooper Raab testified that on August 6, 2013 at approximately 7:30 P.M. he was parked in his patrol vehicle on the right shoulder of northbound I-15 near mile marker 55. The speed limit on I-15 is 75 miles per hour. He testified that his attention was attracted to a blue Chrysler sedan traveling in the No. 1 travel lane that was passing a "semi." Trooper Raab proceeded to follow the Chrysler and pace its speed. He did not recall how long he paced the Chrysler, but he determined that it was traveling at 78 miles per hour. Trooper Raab testified that he has paced many vehicles and received some field training on pacing early in his career. Trooper Raab's patrol vehicle is equipped with radar, but he does not use it because he is not very good at operating it and he does not find it reliable.

Trooper Raab decided to stop the Chrysler for speeding. The audio-video recording system was activated when he turned on the patrol car's emergency lights to signal the Chrysler to stop. The system records 30 seconds back from when it is activated. A DVD of the audio-video

2

recording was admitted into evidence as *Government's Exhibit 3*. Trooper Raab testified that he later reviewed the GPS speed reading on the recording which showed that his vehicle was traveling at 77 miles per hour prior to the stop.

The driver of the Chrysler pulled over to the side of the freeway and stopped near mile marker 59 at 7:51:15 P.M. Trooper Raab exited his patrol car and approached the front passenger side window of the Chrysler where he made contact with the driver, Randy Johnson, who was the only occupant of the vehicle. Trooper Raab testified that Mr. Johnson appeared to be nervous. He fumbled through his wallet for his driver's license and his hand trembled when he handed it to the trooper. Trooper Raab testified that it is common for individuals to be nervous during a traffic stop, but their nervousness usually dissipates during the course of the stop. He testified that Defendant continued to be nervous throughout the stop. Trooper Raab also observed that Defendant's hands and fingernails were dirty. Defendant later told him that he was a mechanic. Trooper Raab stated that Defendant's appearance did not appear to "fit" the new rental vehicle he was driving. He also testified that Defendant's facial characteristics were similar to those of a methamphetamine user-- sunken cheeks, pale skin, and dark rings under the eyes.

Trooper Raab testified that he told the Defendant he had stopped him for speeding and Defendant responded that his cruise control was set at 75 mph. Mr. Johnson provided the trooper with his license and a copy of a car rental agreement which showed that he rented the Chrysler from Avis Car Rental in Burbank, California on August 6, 2013 at 11:36 A.M. The vehicle had a return due date of August 13, 2013 at 11:00 A.M. at the same rental location. *See Government's Exhibit 2.*

The audio-video recording shows that upon making contact with the Defendant, Trooper Raab asked him for his driver's license which Defendant provided. He then asked Mr. Johnson where he was coming from. The Defendant stated California. Trooper Raab asked Defendant where he was going. Defendant stated that he was going to Detroit, Michigan to visit some friends and that he would be in Detroit for about a week. Trooper Raab told the Defendant that the reason he stopped him was that the speed limit is 75 mph and he had him going "over 78." Defendant somewhat excitedly responded "No way, I have this thing!"---apparently referring to the vehicle's

cruise control.  Trooper Raab again asked the Defendant who he was going to see in Detroit.

Defendant answered friends.  Trooper Raab asked what type of friends, and Defendant answered

that they were friends who used to live "out here," but had moved back there.  Trooper Raab then

asked Defendant what type of work he does.  Defendant responded that he was in the junk removal

business.  Trooper Raab asked Defendant where he rented the vehicle and he stated at the airport.

The recording shows that Trooper Raab next asked the Defendant if he had "ever been

arrested before."  Defendant responded yes and the trooper asked him "what for."  Defendant stated

that "back in the day" he had been arrested for all kinds of things such as petty theft.  (Trooper Raab

testified that Defendant also stated that he had been arrested for burglary.)  Trooper Raab asked

Defendant if there were any warrants for his arrest and Defendant said no.  The trooper then stated

"I'll be right back with you," and appeared to be about to move away from the vehicle.  It appears

that Defendant said something to the trooper and there was a brief, but unintelligible, verbal

exchange between them.  Trooper Raab then asked Defendant if he had any marijuana,

methamphetamine, cocaine, heroin, guns, or knives.  Defendant responded no to each question.

The trooper asked him if anyone had paid him to take anything across country.  Defendant also

responded no.  Trooper Raab told the Defendant that he would be right back and returned to his

patrol car at 7:54:20 P.M.

The audio-video recording shows that Trooper Raab remained at or near his patrol car until

8:16 P.M.  During that period, Defendant remained inside the Chrysler.  After leaving Defendant's

vehicle, Trooper Raab turned off his body microphone.  Because he was standing near the patrol

car, however, his cell phone conversations with another officer, Detective Sandoval, were picked up

by the vehicle's microphone.

Trooper Raab testified that during his initial encounter with the Defendant, he appeared to

become more nervous and looked down and away when the trooper asked him if he had any

narcotics, guns or knives.  Trooper Raab testified that California is a source state for illegal

narcotics coming across the border and that Detroit, as well as several other cities throughout the

central or Midwest section of the United States, are destination cities for illegal narcotics.

. . .

4

Trooper Raab testified that after returning to his patrol vehicle, he requested a records check on the Defendant. He did not recall what time he requested the records check and did not record this information in his arrest report. He testified that the response time for a records check varies from dispatcher to dispatcher, but that the passage of 20 minutes before a response is received is not abnormal. Trooper Raab also used his cell-phone to call Las Vegas Metropolitan Police Department (LVMPD) Detective Adrian Sandoval to assist him with the stop. Detective Sandoval operated as a K-9 unit and had a narcotics detection dog. Detective Sandoval told Trooper Raab that he was busy, but that he would contact Detective Schaffner, another K-9 unit officer, to assist Trooper Raab. Detective Sandoval called Trooper Raab back and told him that Detective Schaffner was on the way.

Portions of the audio-video recording was played during the hearing. With the aid of the recording, Trooper Raab testified that he placed a cell phone call to Detective Adrian Gonzalez at 7:57:51 P.M. He did not get through to Detective Gonzalez at that time. He radioed NHP dispatch at 7:58:39 P.M. to request a records check on the Defendant. The NHP dispatcher was busy and unable to immediately take the information for the records check. The dispatcher told him to stand by. Detective Gonzalez called Trooper Raab back at 8:00:37 P.M. Trooper Raab made contact with the NHP dispatcher at 8:01:06 P.M. and provided the records check information. At 8:04:30 P.M., Detective Gonzalez again called Trooper Raab and informed him that Detective Schaffner would assist him. Trooper Raab contacted the "El Paso Intelligence Center" (EPIC) at 8:06:48 P.M. to run another records check on the Defendant. The recording indicates that at approximately 8:10:10 P.M. Trooper Raab thanked one of the officers who arrived on the scene for coming out. Trooper Raab was unable to state whether this was Detective Schaffner or another NHP officer who arrived on the scene. At 8:13:44 P.M. NHP dispatch provided the records check response to Trooper Raab. Trooper Raab then summoned Defendant from his vehicle at 8:16 P.M.

Trooper Raab testified that when he calls for back-up, he routinely does this before he requests a records check. He requested back-up by a K-9 officer in this instance because of his suspicions about Mr. Johnson and his desire to conduct a dog sniff of the vehicle. Trooper Raab testified that his suspicions were aroused by Mr. Johnson's nervousness, his story regarding the

purpose of his travel, that he was traveling from a "source state" to a "source city," and the fact that he was driving a rental car, although this latter fact was not overly significant. He stated that narcotics traffickers sometimes use rental cars to distance themselves from ownership or possession of the vehicle used to transport narcotics. Trooper Raab acknowledged on cross-examination, however, that the Chrysler was rented in Mr. Johnson's name.

Trooper Raab also testified about additional suspicious factors, including Defendant's physical appearance which did not match the vehicle he was driving and that his face had the appearance of a possible methamphetamine user. He also testified that Defendant's extensive criminal record, including narcotics arrests or offenses, added to his suspicions. On cross-examination, Trooper acknowledged that he listed only the following suspicious factors in his arrest report: (1) Defendant was nervous; (2) His stories of his travel were suspicious and confusing; (3) He was traveling from a known source city, Los Angeles or Burbank, California; and (4) He was traveling to a known source city, Detroit Michigan.[1] Trooper Raab acknowledged that he discussed the other factors not mentioned in his report during his meeting with the prosecutor prior to the hearing.

Trooper Raab testified that when Mr. Johnson came back to his patrol car at 8:16 P.M., he still appeared to be nervous and was smoking a cigarette. Under some prompting by Government counsel, Trooper Raab stated that in his opinion people smoke cigarettes to calm themselves. Trooper Raab returned Mr. Johnson's documents to him. He again asked Mr. Johnson about his travel, where he was coming from, where he was going, who he was going to see and how long he was going to be there. Defendant had originally told him he was going to Detroit for a week. He asked the Defendant how long it was going to take him to drive to Detroit and Defendant said three to three and one-half days. He pointed out to the Defendant that if it took him three days to drive to Detroit and three days to return, he would only be there for one day. Defendant stated that he was going to be there for a week. Trooper Raab asked him if he was going to drive or fly back.

---

[1] Although Trooper Raab referred to Detroit as a "source" city, it appears that he intended to state that Detroit is a "destination" city for controlled substances.

Defendant began to say something, but then paused, appeared to change his mind, and stated that he was going to fly back.  Trooper Raab testified that Defendant's statements regarding his travel plans, including flying back from Detroit, were inconsistent with the car rental agreement that required him to return the vehicle in California in one week.

Trooper Raab testified that he gave Defendant a verbal warning for the traffic infraction.  He then asked Defendant if he could speak to him a little bit more and Defendant said yes.  He did not tell Mr. Johnson he was free to leave.  Nor did he tell Defendant that he could not leave or that he was required to answer the trooper's questions.  Defendant did not indicate a desire to leave and was generally compliant with the trooper.  Trooper Raab testified that he again asked Defendant if he had anything illegal in the vehicle.  He asked Defendant if he had marijuana, methamphetamine, cocaine or heroin.  Defendant responded no.  He then asked Defendant if he could search the vehicle.  Defendant said no.  Trooper Raab asked for consent again and Defendant again said no.  He asked Defendant why he would not consent.  Defendant said his friends told him not to let the cops do that.

Trooper Raab testified that after Defendant refused to consent to the search, Detective Schaffner approached the Chrysler with the dog and did "a free air sniff" around the vehicle.  Trooper Raab engaged Mr. Johnson in conversation while Detective Schaffner and the dog moved around the Chrysler.  Detective Schaffner returned from the Chrysler and informed the Defendant that the dog had alerted to the presence of narcotics in the vehicle.  Defendant did not respond to this statement.  Trooper Raab directed Mr. Johnson to stand about fifty feet out in the desert while the officers searched the Chrysler.  While the officers were conducting the search, Defendant fled into the desert.  Mr. Johnson was apprehended and returned to the patrol vehicle.  During the search, the officers found approximately 9,000 grams of methamphetamine in the vehicle's trunk.  They also found marijuana and glass pipes in the console area of the passenger compartment.

The audio-video recording shows that upon being summoned from his vehicle by the trooper, Mr. Johnson exited the Chrysler and walked rapidly to where Trooper Raab was standing at the right front of the patrol vehicle.  Trooper Raab's microphone was turned off when Mr. Johnson came to him.  Approximately the first twenty seconds of their contact cannot be heard.  Trooper

Raab turned on his microphone and continued to speak with Defendant. The recording shows that Defendant initially stated that he intended to stay a week in Detroit and that he had only recently decided to fly back. He stated that the rental contract was for one week, but that he could call and have it extended. He also stated that his travel plans might change depending on the mood of the friends he was visiting. At that point (8:17:20-28 P.M.), Trooper Raab stated: "Like I said, I'm not going to issue a citation or anything like that." He stated that as far as that was concerned, "we're finished with that." Trooper Raab then stated: "Sir, would you mind if I asked any other questions?" Defendant shrugged and said "Yeah," indicating a willingness to answer. Trooper Raab then asked Defendant the litany of questions about narcotics in the vehicle. It appears from the video that Defendant looked at the trooper as he answered no to each of these questions.

Trooper Raab then asked Defendant if he could search the car (8:17:48 P.M.). Defendant said no. The trooper made a second request and Defendant said "No, because I'm not doing anything illegal." Defendant stated that he usually gives officers permission to search, but that friends or other persons had told him not to permit the police to search his vehicle. Defendant and Trooper Raab then engaged in a 30 second discussion about that issue. As this discussion ended (8:18:28 P.M.), Detective Schaffner and the narcotics dog passed by and approached the Chrysler. Defendant can be heard saying "nice dog." Detective Schaffner and the narcotics dog moved around the exterior of the Chrysler for approximately a minute and a half. (8:18:30 to 8:20:02 P.M.) As this took place, Trooper Raab continued to engage Defendant in a discussion about his travel. He also asked Defendant if he had previously been stopped by the police. Defendant indicated that he had been stopped by the police on "I-40." Trooper Raab also asked Defendant about his business and previous employment. Defendant's demeanor during this part of the encounter appeared relatively relaxed and conversational, notwithstanding the activity with the narcotics dog occurring in front of him. Detective Schaffner then approached Defendant and Trooper Raab and stated to the Defendant: "This is a narcotics dog. She alerted to your car." (8:20:04 P.M.) He asked Defendant if he knew why she would do that. Defendant responded no. Trooper Raab told the Defendant that the officers would be searching his car and directed him to a location away from the vehicle.

1       **Detective Ray Schaffner.**

2          The Government called Las Vegas Metropolitan Police Department (LVMPD) Detective

3 Ray Schaffner as a witness during the evidentiary hearing.  Detective Schaffner has been employed

4 by the LVMPD for twenty years.  He has been a narcotics detective for twelve years and a narcotics

5 dog handler for nearly five years.  Detective Schaffner testified that he and narcotics dog Sally were

6 trained together as a narcotics dog team and have worked together for the past five years.  He

7 received 325 hours of training from a master trainer in the LVMPD canine section.  Detective

8 Schaffner testified that Sally was trained to identify the odors of cocaine, methamphetamine,

9 marijuana and heroin.  These odors are introduced to the dog over a period of time and the dog is

10 taught to alert to the odor of narcotics by being given a toy as an award each time she correctly

11 alerts.  The dog is trained to identify the strongest point of the odor.  As the handler, Detective

12 Schaffner's role is to identify behavior which shows that the dog is picking up the odor of a

13 controlled substance and to determine when the dog has given a final alert to the presence of an

14 odor of narcotics.

15          Detective Schaffner described the manner in which Sally alerts to the presence of narcotics.

16 Initially, there is a change in Sally's behavior.  She closes her mouth so that she can sniff with her

17 nose more aggressively.  Her movements become more precise as she tries to bracket the odor and

18 find its strongest source.  When Sally finds the area of the strongest odor, she stops sniffing

19 aggressively, remains still and places her nose roughly an inch away from the source and stares

20 straight ahead.  Detective Schaffner testified that there have been occasions in the field when Sally

21 alerted to the odor of narcotics, but none were found.  On some of those occasions, individuals

22 admitted that they were previously smoking marijuana in the vehicle.  On other occasions, officers

23 found hidden compartments in vehicles where narcotics may have previously been located.

24 Detective Schaffner drew a distinction between cuing the dog to the presence of narcotics in a

25 particular area during a field investigation, versus "presenting" the dog.  He testified that as an

26 example of presenting, he will direct Sally to carefully sniff in the wheel well area of a vehicle

27 where narcotics are often found to make sure that she has fully explored that location for the odor of

28 narcotics.  Detective Schaffner testified that in his five years working with Sally, he has found her

1    alerts to be reliable.

2        Detective Schaffner testified that on August 6, 2013, he went to the subject traffic stop in

3    response to a cell phone call from Trooper Raab who asked if he could assist with a stop and that he

4    needed a dog sniff.  Detective Schaffner testified that when he arrived at the scene, Trooper Raab

5    had just asked the Defendant to exit his vehicle and walk back to the patrol vehicle.  Detective

6    Schaffner testified that he was standing behind Trooper Raab, near the right front fender of his

7    patrol vehicle as the trooper was speaking to the Defendant.  Detective Schaffner testified that he

8    moved forward to conduct the dog sniff immediately upon Defendant Johnson refusing Trooper

9    Raab's request for permission to search the vehicle.

10       Detective Schaffner testified that his standard practice in conducting a dog sniff of a vehicle

11   is to start at the rear bumper on the driver's side and work his way around the vehicle in a counter-

12   clockwise direction.  In this case, Sally first showed a change of behavior at the rear bumper near

13   the trunk seam.  She went up on her hind legs and sniffed the seam of the trunk aggressively.  She

14   then dropped down and moved to the passenger side rear bumper area and went back up on her hind

15   legs and sniffed aggressively on the trunk seam near the taillight area where she gave her final alert

16   to the presence of a narcotics odor.  Detective Schaffner testified that methamphetamine was

17   subsequently found inside the vehicle's trunk.  Marijuana and narcotics paraphernalia, smoking

18   pipes, were also found in the passenger compartment of the vehicle.  Although the audio/video

19   shows Sally standing on her hind legs at the passenger side window, Detective Schaffner testified

20   that she did not alert to this area.  Sally's alert at the rear bumper of the vehicle is blocked from

21   camera view by Defendant Johnson's body.  The audio/video recording, however, shows the dog

22   stopped for a few seconds at the rear bumper area on two or three occasions during the drug sniff.

23       Detective Schaffner testified that he and Sally are certified as a narcotics detection dog team

24   by the LVMPD and the California Narcotic Canine Association.  They are re-certified twice per

25   year by the LVMPD and once per year by the California Association.  Portions of the LVMPD

26   written policy or procedures relating to narcotics dog certification and training were admitted as

27   *Defendant's Exhibit E*.  According to this document, the certification of a narcotics dog and the

28   handler is valid for six months from the date of certification.  The certification official evaluates

whether the dog recognizes and alerts to the odor of narcotics and whether the handler recognizes the dog's alert.  The certification testing includes the placement of heroin, cocaine, methamphetamine and marijuana in four building areas and in three vehicles. The maximum weight of narcotics used in the testing may be unlimited, but a minimum of 14 grams of substance must be used for each find.  The narcotic finds must be placed in the search area for at least thirty minutes prior to the first search team starting certification.  If a detection teams fails to locate/indicate one aide during the certification, they may be tested again that same day if the certification official rules that the miss was the handler's error and requires no retraining of the dog.  All other certification errors require the team to reschedule another certification on a later date.

Detective Schaffner's/Sally's re-certification records were admitted as *Government's Exhibit 6*.  These records show that Detective Schaffner and Sally were re-certified by the LVMPD on August 11, 2010, March 23, 2011, September 14, 2011, February 8, 2012, August 22, 2012 and May 29, 2013.  The LVMPD re-certification form is divided into two parts: vehicles and building interior.  On the May 29, 2013 re-certification form, the  certifying officer checked the "pass" box for the vehicle searches, but did not check the "pass" or "fail" box for the building interior section. Detective Schaffner testified, however, he was told that he and Sally passed the re-certification test. He also testified that if he and Sally had not passed both parts of the re-certification test, they would have been required to retest.  Detective Schaffner and Sally were also certified by the California Narcotic Canine Association on October 23, 2009, October 22, 2010, October 21, 2011, October 18, 2012, and October 18, 2013.  No testimony or other evidence was provided regarding this association's certification protocol.  Detective Schaffner's training history logs indicate, however, that on the dates of the California certifications Sally located narcotics in different locations, which suggests some form of testing similar to the LVMPD certification testing.

Detective Schaffner has also kept track of the number of alerts by Sally that have resulted in the recovery of narcotics or currency.  He testified that Sally has had 76 narcotics finds and 12 currency alerts that have resulted in the recovery of 300,610 grams of marijuana, 3,063 grams of cocaine, 15,815 grams of methamphetamine, 3.7 grams of heroin, and $622,620.00 in currency.  *Government's Exhibit 6.*

1    The LVMPD's written training policy or procedure states that training should be conducted

2    on a daily basis to ensure the unit's proficiency.  It also states that whenever possible, a helper

3    should be utilized to plant the training aides to alleviate the possibility that the dog will respond to

4    the handler's scent, instead of the narcotics.  *Defendant's Exhibit E.*  The LVMPD maintains

5    training history records on the narcotics dogs which are created by the dog handler/officer.  The

6    2012-2014 training history records for Sally are included in *Government's Exhibit 6*.  The training

7    history records include the date and location of the training, whether a helper was used, the type and

8    weight of narcotics, and the location(s) where the narcotics were hidden.  The time the narcotics

9    were sitting in the location before training started and the overall time for the training are also

10   listed.

11   Detective Schaffner testified that he tries to conduct training sessions with Sally three or

12   four times a week, but is not always able to do so because of other commitments.  He also tries to

13   use a helper during training, but trains without a helper when none is available.  Detective Schaffner

14   testified that it is important to use diversions, such as food, plastics, toys or other items during

15   training to ensure that the dog will not be diverted away from identifying narcotics.  The training

16   history records between January 1, 2013 and August 6, 2013 show that Detective Schaffner

17   conducted training on 15 days in January, 10 days in February, 12 days in March, 14 days in April,

18   14 days in May, 15 days in June, 12 days in July, and 3 days during the first week of August prior to

19   the subject traffic stop on August 6, 2013.  Of these 95 training days, a helper was used on 79 days.

20   The records indicate that diversions were used in only 8 training sessions during this period.

21   Overall, the records indicate that diversions were infrequently used during training sessions.

22   Detective Schaffner testified that Sally has never committed an alert error during training.

23   Detective Schaffner testified that he also included some actual deployment incidents in the

24   training records.  He stated that this may include a training exercise at the scene where another

25   narcotics dog has already alerted to narcotics.  Detective Schaffner included the subject August 6,

26   2013 incident in Sally's training records.  He testified that after the narcotics were discovered in the

27   Defendant's vehicle, he redeployed Sally to the vehicle and had her re-alert to the presence of the

28   narcotics odor in the trunk.  Detective Schaffner then gave Sally her toy for having correctly alerted

1  to the narcotics.  This is confirmed by a review of the audio/video recording.  Detective Schaffner

2  acknowledged that he arbitrarily indicated that the narcotics had been present in the location for 20

3  minutes prior to the training.  He also reported that the training time was 10 minutes, even though

4  the actual time that Sally sniffed around Defendant's vehicle before alerting to narcotics was

5  approximately one minute and thirty seconds as shown on the audio/video recording.

6  ### DISCUSSION

7  **1.     Validity of the Vehicle Stop.**

8          The Fourth Amendment to the United States Constitution protects the right of the people to

9  be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures.

10  The Fourth Amendment further provides that no warrants shall issue, but upon probable cause,

11  supported by oath or affirmation.  A police officer's conduct in stopping a motor vehicle for a

12  suspected traffic violation is a seizure within the meaning of the Fourth Amendment.  *Delaware v.*

13  *Prouse,* 440 U.S. 648, 653, 99 S.C. 1391, 1396 (1979).  Where the officer has reasonable suspicion

14  or probable cause to believe that a violation of traffic laws has occurred, he may stop and detain the

15  vehicle and its occupants to investigate the infraction.  *Whren v. United States,* 517 U.S. 806, 809,

16  116 S.C. 1769 (1996); *United States v. Lopez Soto,* 205 F.3d 1101, 1104-5 (9th Cir. 2000).  Trooper

17  Raab testified that he stopped Defendant's vehicle because it was traveling 78 miles per hour in a

18  75 mile per hour zone.  The audio-video recording supports his testimony that Defendant's vehicle

19  was traveling two or three miles per hour over the speed limit.  Although this may be viewed as a

20  minor speeding violation, it provided Trooper Raab with probable cause to stop the vehicle for

21  speeding.  Therefore, the stop did not violate the Fourth Amendment.

22  **2.     Whether the Duration of Defendant's Detention for the Traffic Stop**
23  **Violated the Fourth Amendment.**

24          During a routine traffic stop, a police officer may lawfully request the operator's drivers

25  license, vehicle registration and insurance information, run a records check on the driver and

26  vehicle, and issue a citation or warning.  Questions regarding the driver's travel plans are

27  considered relevant to the traffic stop.  *United States v. Diaz-Castaneda*, 494 F.3d 1146, 1153 n. 2

28  (9th Cir. 2007), citing *United States v. Foreman*, 369 F.3d 776, 781 (4th Cir. 2004) and *United*

1   *States v. Hill*, 195 F.3d 258, 268 (6th Cir. 1999).  *See also United States v. Chavez-Valenzuela*, 268

2   F.3d 719, 724 n. 4 (9th Cir. 2001).  The length and duration of the detention must be justified by the

3   circumstances authorizing its initiation.  *Pierce v. Multnomah County, Or.*, 76 F.3d 1032, 1038 (9th

4   Cir. 1996).

5          Police officers may ask about matters unrelated to the purpose of the traffic stop so long as

6   their questions do not unnecessarily prolong the detention.  *Arizona v. Johnson*, 555 U.S. 323, 333,

7   129 S.C. 781, 788 (2009) ("An officer's inquiries into matters unrelated to the justification for the

8   traffic stop . . . do not convert the encounter into something other than a lawful seizure, so long as

9   the inquiries do not measurably extend the duration of the stop").  *See also Muehler v. Mena*, 544

10  U.S. 93, 101, 125 S.C. 1465, 1471 (2005) and *United States v. Mendez*, 476 F.3d 1077, 1080-81

11  (9th Cir. 2007).  In *Illinois v. Caballes*, 543 U.S. 405, 408, 125 S.C. 834, 836-837 (2005), the

12  Supreme Court also held that officers may conduct a dog sniff of the exterior of an individual's

13  vehicle for the presence of narcotics so long as the traffic stop is not unnecessarily prolonged by this

14  activity.  If the officers develop reasonable suspicion during the traffic stop that the individual is

15  engaged in other criminal activity, then they may broaden the scope of their investigation and

16  reasonably extend the detention to investigate their suspicions.  *United States v. Perez*, 37 F.3d 510,

17  513 (9th Cir. 1994) and *United States v. Baron*, 94 F.3d 1312, 1319 (9th Cir. 1996).

18         In *United States v. Turvin*, 517 F.3d 1097 (9th Cir. 2008), a state trooper stopped

19  defendant's vehicle for traffic violations.  The trooper was in his patrol vehicle writing out traffic

20  citations, when a second trooper arrived and informed him that a rolling methamphetamine

21  laboratory had been found in defendant's vehicle a year earlier.  The first trooper thereupon stopped

22  writing the citations, went to defendant's vehicle and told him that he knew about the rolling

23  methamphetamine laboratory, which the defendant acknowledged.  The trooper asked for consent to

24  search the vehicle, which the defendant granted.  During the search, the troopers discovered an

25  illegal firearm and methamphetamine.  In holding that the trooper did not unreasonably prolong the

26  traffic stop to investigate other possible criminal activity, the court noted that the total duration of

27  the stop up to defendant's consent to the search was approximately fourteen minutes, which is not

28  unreasonably long for an ordinary traffic stop.  *Turvin*, 517 F.3d at 1101-02.  The court held that the

additional time expended to question defendant about narcotics and obtain his consent to search the

vehicle did not unreasonably prolong the traffic stop.  The court further stated that officers are not

required to move at top speed when executing a lawful traffic stop.  Quoting *United States v.*

*Hernandez*, 418 F.3d 12, 205, 1212 n. 7 (11th Cir. 2005), the court stated:

> A traffic stop for speeding can doubtlessly last long enough for the
> police to ask questions about the reasons for the speeding and to
> conduct a variety of checks about licenses, registration, insurance and
> so on.  We underline that the police are not constitutionally required
> to move at top speed or as fast as possible.  For the police to be
> vigilant about crime is, at least broadly speaking, a good thing.  And
> at a traffic stop, the police can occasionally pause for a moment to
> take a breath, to think about what they have seen and heard, and to
> ask a question or so.  The police are authorized to detain traffic
> violators for a *reasonable* amount of time.

*Turvin*, 517 F.3d at 1102.

The Fourth Circuit has stated that delays of one or two minutes caused by questions

unrelated to the purpose of the stop are *de minimis* intrusions that do not violate the Fourth

Amendment. *United States v. Mason*, 628 F.3d 123, 132 (4th Cir. 2010).

Other circuits have held that a brief extension of a traffic stop by a few minutes to conduct

and complete a dog sniff constitutes only a *de minimis* intrusion that does not violate the

defendant's Fourth Amendment rights.  *United States v. McBride*, 635 F.3d 879, 883 (7th Cir.

2011); *United States v. Chaney*, 584 F.3d 20, 26 (1st Cir. 2009); *United States v. Alexander*, 448

F.3d 1014, 1017 (8th Cir. 2006); and *United States v. Mohamed*, 600 F.3d 1000, 1005-06 (8th Cir.

2010).  In *Alexander*, the court held that a dog sniff of the vehicle which was completed within four

minutes after the officer told the driver that he would be given a warning ticket did not violate the

Fourth Amendment.  In *Mohamed*, the court held that a dog sniff, which was completed within five

minutes after the traffic stop ended, did not unreasonably prolong the traffic stop.  The officer had

also developed reasonable suspicion during the stop that defendant was engaged in other criminal

activity which also justified the extension of the stop.

In *State v. Beckman*, 305 P.3d 912, 129 Nev.Adv.Op. 51 (2013), however, the Nevada

Supreme Court held that an additional nine minute extension of the traffic stop in order to obtain a

dog sniff of defendant's vehicle violated the Fourth Amendment.  The highway patrol trooper in

*Beckman* completed the traffic stop approximately nine minutes after he stopped defendant's vehicle. After returning defendant's license and registration to him and indicating that he was free to leave, the trooper asked defendant if he would be willing to answer a few questions. The defendant agreed to do so. The  trooper asked the defendant if he had anything illegal in the vehicle and if he would consent to a search. The defendant stated that he did not have anything illegal, but refused to consent to a search. At that point the trooper told the defendant he was not free to leave and would have to wait for the K-9 unit to arrive to perform a sniff search. The K-9 unit arrived approximately seven minutes later and the dog sniff was completed two minutes after that. In holding that the delay of nine minutes was not *de minimis*, the Court noted that it doubled the length of the traffic stop.

The duration of the traffic stop in this case was considerably longer than those in the above cited cases. Approximately 25 minutes elapsed from the time Defendant's vehicle was stopped until Trooper Raab informed Defendant that he would not issue him a citation for the speeding violation. Detention for a traffic stop may not continue for an unreasonable time. As the Supreme Court stated in *United States v. Sharpe*, 470 U.S. 675, 685, 105 S.C. 1568, 1575 (1985), "if an investigative stop continues indefinitely, at some point it can no longer be justified as an investigatory stop." The Court noted, however, that there is no rigid time limitation on *Terry* stops. A traffic stop of 25 minutes, due in large part to the time waiting for a return on a records check, does not, in and of itself, exceed the bounds of reasonableness.

Trooper Raab's initial contact with Defendant at his vehicle lasted approximately 2 minutes and 20 seconds. Of that time, less than 30 seconds involved questions about narcotics or weapons. It is clear from Trooper Raab's testimony that upon returning to his patrol vehicle, he intended to obtain backup by a K-9 officer in order to conduct a dog sniff on Defendant's vehicle, and possibly conduct a search for narcotics or other contraband. Instead of immediately requesting a records check, Trooper Raab first attempted to contact Detective Gonzalez or another K-9 officer to provide back-up. He did not contact NHP dispatch for a records check until approximately 4 minutes and 20 seconds after he returned to his patrol vehicle. The dispatcher initially placed Trooper Raab on standby and did not get back to him for another 2 minutes to proceed with the request. The

1    dispatcher thereafter provided the records check information to Trooper Raab at 8:13:44 P.M.  The

2    total time for the records check from when Trooper Raab first called dispatch was 15 minutes.

3    There is no evidence that the dispatcher delayed providing a return on the records check to

4    accommodate the arrival of the K-9 unit.

5        A little more than a minute passed after Trooper Raab received the results of the records

6    check until he summoned the Defendant from his vehicle.  Trooper Raab spent another minute

7    again asking Defendant about his travel plans.  He then told the Defendant that he was not going to

8    issue him a citation and that "we're finished with that."  He asked Defendant if he would mind

9    answering additional questions.  The Defendant agreed to do so.  Although Trooper Raab did not

10   expressly tell Defendant he was free to leave, the audio-video recording supports the conclusion

11   that the ensuing encounter was consensual and that Defendant was no longer being detained.  An

12   additional four minutes elapsed during which Trooper Raab asked Defendant additional questions,

13   requested his consent to search the vehicle, and Detective Schaffner conducted the dog sniff.

14   During that period, Defendant did not attempt to leave.  Nor did he make any statement expressing

15   his desire to terminate the discussion with Trooper Raab.

16       The delay attributable to Trooper Raab's effort to obtain a dog sniff of the vehicle occurred

17   near the beginning of the traffic stop, rather than at its end.  It is possible the traffic stop could have

18   been completed four to five minutes earlier if Trooper Raab had promptly requested a records

19   check.  Any such conclusion, however, is speculative because it is unknown how soon dispatch

20   would have completed the records check if it had been requested earlier.  Assuming that Trooper

21   Raab did not have reasonable suspicion to believe that Defendant was transporting narcotics, the

22   extension of the traffic stop caused by his effort to obtain back-up by a K-9 unit for a dog sniff is on

23   the borderline of reasonableness under the foregoing cases.  Based on the totality of the

24   circumstances, however, the Court finds that this delay constituted no more than a *de minimis*

25   intrusion on Defendant Johnson's Fourth Amendment rights.  In this regard, Defendant Johnson

26   made no effort to depart after he was informed that no citation would be issued.  Instead, he agreed

27   to answer the trooper's questions and engaged in a fairly informal conversation with him for the

28   next several minutes.  Unlike the trooper in *Beckman*, Trooper Raab did not tell Mr. Johnson that he

was not allowed to leave until the dog sniff was completed.  It may be fair to say that Trooper Raab distracted Mr. Johnson by further questions while Detective Schaffner conducted the dog sniff.  Mr. Johnson, however, neither objected to the dog sniff or nor expressed a desire to leave.  The Court therefore finds that the traffic stop was not unreasonably prolonged by Trooper Raab's effort to obtain back-up by a K-9 officer so that a dog sniff of Defendant's vehicle could be conducted.

**3.    Whether the Trooper Had Reasonable Suspicion to Believe that Defendant Was Engaged in Other Criminal Activity.**

If Trooper Raab developed reasonable suspicion during the traffic stop to believe that Defendant was transporting narcotics, then any additional time he spent investigating that suspicion was reasonable and no Fourth Amendment violation occurred.

"[T]he Fourth Amendment is satisfied if the officer's action is supported by reasonable suspicion to believe that criminal activity 'may be afoot.'" *United States v. Arvizu*, 534 U.S. 266, 273, 122 S.C. 744, 750 (2002), citing *United States v. Sokolow*, 490 U.S. 1, 7, 109 S.C. 1581 (1989) and *Terry v. Ohio*, 392 U.S. 1, 30, 88 S.C. 1868 (1968).  In determining whether an officer had reasonable suspicion, the court must "look at the 'totality of the circumstances' of each case to see whether the officer had a 'particularized and objective basis' for suspecting legal wrongdoing. (internal citation omitted).  This process allows officers to draw on their own experience and specialized training to make inferences from and deductions about the cumulative information available to them that 'might well elude an untrained person.'" *Id.*  An officer's mere "hunch, however, is insufficient to justify a stop or further detention. *Id.*, citing *Terry*, 392 U.S. at 27.  The Court in *Arvizu* rejected an approach in which the court evaluates and rejects individual factors in isolation and fails to take into account the totality of the circumstances.  The Court noted its statement in *Terry* that while each of a series of acts was perhaps innocent in itself, taken together they warranted further investigation.  The court is not required to disregard a factor because there may be an innocent explanation for suspect's behavior. *Id.*, 534 U.S. at 273-74, 122 S.C. at 751.

The courts have identified a variety of factors which taken together may provide a police officer with reasonable suspicion to believe that the occupants of a motor vehicle are transporting illegal narcotics or other contraband.  These include an unusual degree of nervousness on the part of

the individual. *United States v. Perez*, 37 F.3d 510, 514 (9th Cir. 1994). However, even severe nervousness, standing alone, does not provide reasonable suspicion. *United States v. Chavez-Valenzuela*, 268 F.3d 719, 725-26 (9th Cir. 2001). Inconsistent, vague or evasive stories about travel plans, such as who the individual is going to visit or where he intends to stay upon arrival, is a factor; as is taking a long distance trip by automobile with only a short stay at the place of destination. *United States v. Rojas-Millan*, 234 F.3d 464, 470 (9th Cir. 2000); *United States v. Garcia*, 205 F.3d 1182, 1185 (9th Cir. 2000); *United States v. Baron*, 94 F.3d 1312, 1319 (9th Cir. 1996). The fact that neither the driver nor passenger is the registered owner of the vehicle, or the vehicle is rented may also be factors. *United States v. Murrillo*, 255 F.3d 1169, 1174 (9th Cir. 2001). Traveling from a city known to be a source of narcotics to a city known to be a destination hub for narcotics is also a factor. *Perez*, 37 F.3d at 514. An inconsistency between the suspect's appearance and the nature of the work he performs can also contribute to a finding of reasonable suspicion. *Id.*

Trooper Raab listed the following suspicious factors in the arrest report which he prepared shortly after Defendant's arrest: Defendant was nervous. His travel story was suspicious and confusing and he was traveling from a known narcotics source state to a known narcotics destination city. During the hearing, Trooper Raab also testified that defendant's physical appearance did not match the vehicle he was driving. His facial characteristics also indicated possible methamphetamine use. Trooper Raab also indicated that the fact that the Chrysler was a rental car was a factor. Trooper Raab also testified that the information regarding Defendant's prior arrests or convictions for drug related offenses and other crimes contributed to his suspicion. The Court gives less credence to these latter factors since they were not referenced by Trooper Raab in the report he prepared shortly after the arrest. That said, it is probable that Trooper Raab would have considered Defendant's prior criminal record in assessing the possibility that he was transporting narcotics.

The information that Defendant provided regarding his travel plans was the most significant factor supporting Trooper Raab's suspicions. Defendant initially told the trooper that he was traveling from California to Detroit, Michigan to visit friends. When the trooper asked him what

friends, Defendant vaguely responded friends who used to live "here," but now live there.  The car rental agreement provided for a one-week rental and for the return of the vehicle in California.  The stop occurred on the same day that Defendant rented the Chrysler.  Given the travel time between Southern California and Detroit, Defendant would have only been able to stay in Detroit one day, at most, before driving back to California.  Such travel is consistent with that of an illegal narcotics courier.  Defendant's subsequent explanation regarding his travel also lacked credibility.  He told the trooper he planned to stay one week in Detroit and could call and extend the rental agreement.  If he was planning to stay a week in Detroit on the same day he rented the car, however, it did not make sense to rent it for only one week.  He also told the trooper that he had just decided to fly back from Detroit, without explaining how he would return the rental vehicle.  Defendant's nervousness, his conduct in looking down and away when the trooper initially asked him about the presence of drugs, and the fact that he was traveling from a source state to a destination city for narcotics provided further support for the trooper's suspicions that Defendant was transporting narcotics or illicit currency.  The fact that Defendant had a significant prior criminal history also provided additional support for the trooper's suspicions.

Defendant argues that other factors which indicate that an individual is transporting narcotics were absent in this case.  There were no air fresheners or perfumes present which are sometimes used to mask the odor of narcotics.  There was no evidence that Defendant had two or more cell phones which may be used to contact co-conspirators while the drug courier is on the road.  While the presence of such items would have strengthened a finding of reasonable suspicion, their absence does not refute it.  The Court finds that Trooper Raab had reasonable suspicion to believe that Defendant was transporting illegal narcotics or illicit currency.  He was therefore justified in extending the duration of the stop as reasonably necessary to investigate this suspicion, including making arrangements to have a K-9 officer come to the scene to conduct a narcotics dog sniff.

**4.    Whether the Dog Sniff Provided Probable Cause to Search the Vehicle.**

A positive alert to the presence of narcotics by a properly trained, certified and reliable narcotics detection dog is sufficient to provide probable cause to search.  *United States v.*

1    *Lingenfelter*, 997 F.32d 632, 639 (9th Cir. 1992). What constitutes sufficient evidence of a

2    narcotics dog's reliability was addressed by the Supreme Court in *Florida v. Harris*, --- U.S. ---,

3    133 S.C. 1050 (2013). The Court reversed a decision by the Florida Supreme Court which held that

4    the fact a narcotics dog has been trained and certified is not alone sufficient to establish probable

5    cause. The Florida court held that the state must present the dog's training and certification records,

6    an explanation of the meaning of the particular training and certification, field performance records,

7    including any unverified alerts, and evidence concerning the experience and training of the officer

8    handling the dog. The Florida court stressed the need for evidence of the dog's field performance

9    records, including how often the dog alerted without contraband being found. The Supreme Court

10   rejected the Florida court's use of a "strict evidentiary checklist" to establish the reliability of a

11   narcotics dog. The Court stated that the reliability of a narcotics dog, like other probable cause

12   questions, is to be determined based on the totality of the circumstances. *Id.* at 1055-1056.

13        The Supreme Court also criticized the Florida court's emphasis on the importance of records

14   regarding a narcotic dog's field performance. The Court noted that errors may abound in such

15   records. If a dog fails to alert to a car containing drugs, the mistake will usually go undetected

16   because the officers will not initiate a search. Conversely, a narcotics dog does not necessarily

17   make an error when it alerts to a car in which no narcotics are found. The dog may have detected

18   substances that were too well hidden to be found, or may have smelled the odor of drugs previously

19   in the vehicle or on the driver's person. *Id.* 133 S.C. at 1056. The Court stated:

20        By contrast, those inaccuracies---in either direction---do not taint
     records of a dog's performance in standard training and certification

21   settings. There, the designers of an assessment know where the drugs
     are hidden and where they are not---and so where a dog should alert

22   and where he should not. The better measure of a dog's reliability
     thus comes away from the field in controlled testing environments.

23

24        For that reason, evidence of a dog's satisfactory performance in a
     certification or training program can itself provide sufficient reason to

25   trust his alert. If a bona fide organization has certified a dog after
     testing his reliability in a controlled setting, a court can presume

26   (subject to any conflicting evidence offered) that the dog's alert
     provides probable cause to search. The same is true, even in the

27   absence of formal certification, if the dog has recently and
     successfully completed a training program that evaluated his
     proficiency in locating drugs. After all, law enforcement units have

28   their own strong incentive to use effective training and certification

1
2

> programs, because only accurate drug-detection dogs enable officers to locate contraband without incurring unnecessary risks or wasting limited time and resources.

3 *Florida v. Harris*, 133 S.C. at 1057.

4     The defendant must be afforded the opportunity to challenge evidence of a dog's reliability,

5 whether by cross-examining the testifying officer or by introducing his own fact or expert

6 witnesses.  The defendant may question the adequacy of a certification or training program, perhaps

7 by asserting that its standards are too lax or its methods faulty.  *Id.* at 1057.  Although the Supreme

8 Court discounted the overriding importance of field results, it noted that the dog's performance in

9 the field may also be relevant in determining its reliability.  *Id.*  Circumstances surrounding a

10 particular alert may also undermine the case for probable cause, such as if the officer cued the dog,

11 consciously or not, or the team was working in unfamiliar conditions.  *Id.* at 1058.

12     In *United States v. Thomas*, 726 F.3d 1086, 1096 (9th Cir. 2013), the Ninth Circuit

13 reiterated its statement in *United States v. Cedano-Arrellano*, 332 F.3d 568 (9th Cir. 2003) that a

14 defendant is entitled to obtain the narcotics dog handler's log, as well as training records and score

15 sheets, certification records and training standards and manuals in order to assess the reliability of

16 the narcotics detection dog.  *Thomas* further states that "[e]vidence from a trained and reliable

17 handler about alert behavior he recognized in his dog can be the basis for probable cause.  Whether

18 a particular dog displays enough signaling behavior will depend on the facts and circumstances of

19 each case."  *Id.* at 1098.

20     The LVMPD certification records in this case show that Detective Schaffner and Sally were

21 re-certified by the LVMPD on a semi-annual basis.  The LVMPD written policy and  procedure also

22 provides information about the certification process which indicates its overall reliability.  The May

23 29, 2013 re-certification for Detective Schaffner and Sally is open to some question, however,

24 because the certifying officer did not check the "pass" box for the building interior section.

25 Detective Schaffner testified, however, that he and Sally passed both sections of the re-certification

26 test.  The Court finds his testimony to be credible in this regard.  Detective Schaffner and Sally

27 were also certified on an annual basis by the California Narcotics Canine Association.  No

28 information was provided, however, regarding nature of this association or its requirements for

1  certification. Due to the absence of such information, the Court gives little weight to the

2  certifications of this association.

3          Detective Schaffner's training records for Sally indicate that he conducted training on a

4  regular basis, although not as frequently as the LVMPD policy recommends. Detective Schaffner

5  rarely used diversions in the training and he included actual field deployments as training sessions

6  which casts some doubt on the sufficiency of the training. Detective Schaffner's testimony that

7  Sally has never committed an alert error during five years of training, while indicating a high level

8  of proficiency, could also suggest that the training regimen is lax. These doubts notwithstanding,

9  the evidence supports the conclusion that as of August 6, 2013, Detective Schaffner and Sally were

10 properly trained and certified as a narcotics detection team, such that Sally's alerts to the presence

11 of narcotics odor would support a finding of probable cause to search. Based on Detective

12 Schaffner's testimony, the Court also finds that Sally gave a reliable, positive alert to the presence

13 of narcotics in the trunk of Defendant Johnson's vehicle which provided probable cause to search

14 the vehicle.

15                                              **<u>CONCLUSION</u>**

16         The Court finds that Nevada Highway Patrol Trooper Raab did not unreasonably prolong

17 the traffic stop of Defendant Johnson in order to obtain a dog sniff of the vehicle. During the

18 course of the traffic stop, Trooper Raab also developed reasonable suspicion to believe that

19 Defendant Johnson might be transporting narcotics or other contraband, which justified an

20 extension of the traffic stop to obtain a dog sniff of the vehicle for the presence of narcotics.

21 Finally, the Court finds that Detective Schaffner and narcotics dog Sally were a reliable narcotics

22 detection team, such that Sally's alert to the presence of the odor of narcotics in the trunk of

23 Defendant's vehicle provided probable cause to search it. Accordingly,

24 . . .

25 . . .

26 . . .

27 . . .

28 . . .

## RECOMMENDATION

**IT IS RECOMMENDED** that Defendant's Motion to Suppress Evidence for Fourth Amendment Violation (#23) be **denied**.

DATED this 7th day of August, 2014.

_____
GEORGE FOLEY, JR.
United States Magistrate Judge